UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 3:24-CR-00121-1 |
| v. | ) | |
| | ) | CHIEF JUDGE CAMPBELL |
| [1] JAMES BRANDON WASHBURN | ) | |
| a/k/a "Brady" | ) | |

## PLEA AGREEMENT

The United States of America, through Robert E. McGuire, Acting United States Attorney, and Assistant United States Attorneys Sarah K. Bogni and Robert S. Levine, and defendant, JAMES BRANDON WASHBURN, through defendant's counsel, Luke Evans, pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, have entered into an agreement, the terms and conditions of which are as follows:

### Charges and Penalties in This Case

1.    Defendant acknowledges that he has been charged in the Indictment in this case with the following offenses:

    a.    Count 1: Conspiracy to defraud the United States and to commit offenses, namely the paying and receiving of kickbacks, in violation of the Anti-Kickback statute, all in violation of Title 18, United States Code, Section 371. If convicted on Count 1, defendant faces the following maximum penalties: up to five years' imprisonment; up to a $250,000 fine; supervised release of up to three years; and a special assessment of $100.

    b.    Counts 2-11: Offer or payment of kickbacks to induce payment under a Federal health care program and aiding and abetting the same, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A), and Title 18, United States Code, Section

2. If convicted on any of Counts 2-11, defendant faces the following maximum penalties: up to ten years' imprisonment; up to a $250,000 fine; supervised release of up to three years; and a special assessment of $100.

      c.     Counts 12-17: Solicitation or receipt of kickbacks to induce payment under a Federal health care program and aiding and abetting the same, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A), and Title 18, United States Code, Section 2. If convicted on any of Counts 12-17, defendant faces the following maximum penalties: up to ten years' imprisonment; up to a $250,000 fine; supervised release of up to three years; and a special assessment of $100.

      d.     Count 18: Conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349. If convicted on Count 18, defendant faces the following maximum penalties: up to ten years' imprisonment; up to a $250,000 fine; supervised release of up to three years; and a $100 special assessment.

      e.     Counts 19-23: Health care fraud and aiding and abetting the same, in violation of Title 18, United States Code, Sections 1347 and 2. If convicted on any of Counts 19-23, defendant faces the following maximum penalties: up to ten years' imprisonment; up to a $250,000 fine; supervised release of up to three years; and a $100 special assessment.

Defendant also understands that the Indictment contains a forfeiture allegation pursuant to Title 18, United States Code, Section 982(a)(7).

      2.     Defendant has read the charges against him contained in the Indictment. Those charges have been fully explained to him by his attorney. Defendant fully understands the nature and elements of the crimes with which he has been charged.

3.     By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to Counts 1 and 18 of the Indictment. In addition, as further provided below, defendant agrees to the entry of a forfeiture judgment. Defendant further understands that the Court must order restitution to the victims of the offense in an amount ordered by the Court. After sentence has been imposed on the counts to which defendant pleads guilty as agreed herein, the Government will move to dismiss the remaining counts of the Indictment as to the defendant.

## Acknowledgements and Waivers Regarding Plea of Guilty

## Nature of Plea Agreement

4.     This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 3:24-CR-00121-1.

5.     Defendant understands that by pleading guilty he surrenders certain trial rights, including the following:

a.     If defendant persisted in a plea of not guilty to the charges against him, he would have the right to a public and speedy trial. Defendant has a right to a jury trial, and the trial would be by a judge rather than a jury only if defendant, the government, and the Court all agreed to have no jury.

b.     If the trial were a jury trial, the jury would be composed of twelve laypersons selected at random. Defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause, or without cause by exercising so-called peremptory challenges. The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty. The jury would be instructed that defendant

3

is presumed innocent; that the government bears the burden of proving defendant guilty of the charges beyond a reasonable doubt; and that it must consider each count of the Indictment against defendant separately.

    c.     If the trial were held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not the judge was persuaded of defendant's guilt beyond a reasonable doubt.

    d.     At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them. In turn, defendant could present witnesses and other evidence on his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court.

    e.     At a trial, defendant would have a privilege against self-incrimination so that he could testify or decline to testify, and no inference of guilt could be drawn from his refusal to testify.

6.     Defendant understands that by pleading guilty he is waiving all of the trial rights set forth in the prior paragraph. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

Factual Basis

7.     Defendant will plead guilty because he is in fact guilty of the charges contained in Counts 1 and 18 of the Indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt:

4

## Count 1

With respect to Count 1 of the Indictment, from 2018 and continuing until June 2024, in the Middle District of Tennessee and elsewhere, defendant did willfully and knowingly conspire and agree with Robert Houston McDowell, and others, including marketers and owners and affiliates of laboratories, pharmacies, durable medical equipment ("DME") supply companies, and telemedicine companies, to defraud the United States, and to commit an offense against the United States by knowingly and willfully soliciting and receiving kickback payments, and knowingly and willfully offering and paying kickback payments in violation of Title 42 United States Code, Section 1320a-7b(b), and all in violation of Title 18, United States Code, Section 371. Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b) and "Federal health care program" as defined in Title 42, United States Code, Section 1320a-7b. Medicare is a health care benefit program affecting commerce and is administered through the U.S. Department of Health and Human Services.

Defendant owned and operated DME supply companies and had an interest in companies owned by co-conspirators during the course of the conspiracy. These companies included Black Bear Medical, LLC, Limestone Medical, LLC, RiseMedical, LLC, and Iris Med, LLC (the "DME companies"), all headquartered in the Middle District of Tennessee. Defendant enrolled the DME companies in Medicare or knew that the DME companies had been enrolled in Medicare. The defendant agreed to comply with federal laws in submitting claims to Medicare for reimbursement, including abiding by the Anti-Kickback Statute and not submitting false or fraudulent claims. From in or about fall of 2019 until June 2024, Defendant and his co-conspirators, through the DME companies, submitted false and fraudulent claims to Medicare for DME claims based on orders for DME and patient information that were procured through kickbacks paid to marketing companies, telemedicine companies, and others, and were not eligible for reimbursement, including because they were not medically necessary.

Defendant and his co-conspirators obtained "patient leads," which were lists containing personally identifiable information, such as names and telephone numbers, for Medicare beneficiaries. Marketing companies used various aggressive methods to target Medicare beneficiaries, including the use of call centers, to contact these Medicare beneficiaries and encourage them to accept DME in the form of orthotics, like braces. Defendant and his co-conspirators agreed with these marketing companies and paid the marketing companies kickbacks and bribes to induce them to obtain doctor orders for the DME and patient information that could be used to bill Medicare.

Once Defendant and his co-conspirators had the signed doctor orders and patient information, they submitted and caused to be submitted false and fraudulent claims to Medicare for DME and then paid other co-conspirators to ship the DME to the patients. Defendant and his co-conspirators knew that the DME for which

5

they were seeking payment were procured through kickbacks and bribes and were not eligible for reimbursement.

From approximately 2018 through 2024, Defendant, personally, through his companies, Global Med Marketing, LLC and Washburn Medical, LLC, and with his co-conspirators, including through Limestone Medical, LLC, acted as a marketer and was paid kickbacks in exchange for providing Cancer genomic ("CGx") testing referrals for Medicare beneficiaries to laboratories, DME referrals to DME suppliers, and referrals for medications to pharmacies. Defendant and his co-conspirators knew they were paid kickbacks by the companies for these referrals. Likewise, Defendant and his co-conspirators knew and intended to pay kickbacks to purported telemedicine companies in exchange for signed doctors' orders for the items or services. Defendant knew that the healthcare entities would submit claims to Medicare based on the referrals.

Defendant admits the payments described above constituted kickbacks and knew at the time of his conduct that paying or receiving such payments was unlawful.

Defendant admits that the following acts occurred in furtherance of the conspiracy, and that at least one act occurred in the Middle District of Tennessee:

A.      On or about April 11, 2018, **[1] WASHBURN**, through Global Med Marketing, entered into a contract with Telemedicine Company #1 to obtain doctors' orders and obtained access to the telemedicine portal.

B.      On or about June 20, 2018, **[1] WASHBURN** entered into a contract with Laboratory #1 on behalf of Global Med Marketing for purported laboratory genetic testing marketing.

C.      On or about February 4, 2019, **[1] WASHBURN** entered into a contract with Pharmacy #1 and Co-Conspirator #1 for purported pharmacy marketing services.

D.      On or about June 4, 2019, **[1] WASHBURN** sent an email to Co-Conspirator #2, the purported owner of Telemedicine Company #2 and copied **[2] MCDOWELL**, and stated: "I am getting him involved in my business and I recommended you for telemedicine. Like me, he will prepay for your services and needs an invoice for 40 consults at the same rate at $85 each for a total of $3,400. Can you please send him a contract and agreement to the following."

E.      On or about June 13, 2019, **[1] WASHBURN** sent an email to Co-Conspirator #1 stating "can you please send me the document that I use to bill you for billable hours? I need to get paid for the deals that have gone through," and attaching signed doctors' orders for pharmacy foot bath medications.

F.      On or about September 25, 2019, **[1] WASHBURN** traveled to Missouri to meet with Co-Conspirator #1 of Pharmacy #1 to learn how to set up a DME company.

6

G.      On or about October 4, 2019, **[1] WASHBURN** sent a text message to Co-Conspirator #3 regarding Co-Conspirator #1 and stated "the wire is going to have to be on Monday bc you and I have to submit an invoice for him with billed hours. Let's do that first thing Monday morning and submit to him separately. I had an email typed up but stopped bc I don't want a record of that bc the OIG May take issue with how I present it to him. Want this clean and above board."

H.      On or about January 14, 2020, **[1] WASHBURN** signed and submitted a DME supplier application to CMS for Black Bear Medical LLC.

I.      On or about March 25, 2020, **[1] WASHBURN** entered into a contract with Marketing Company #1 on behalf of Black Bear Medical LLC that purported to contract for marketing services.

J.      On or about March 10, 2020, **[1] WASHBURN** sent a message in a group text to **[2] MCDOWELL** and Co-Conspirator #3 stating "Y'all can both run 5 DO's through me the first month or so. FYI. Talking to Bobby in the morning to go ahead and carve out DO's for us. Probably start in a month." **[2] MCDOWELL** responded "I love it let's go."

K.      On or about March 18, 2020, **[1] WASHBURN** sent a message in a group text to **[2] MCDOWELL** and Co-Conspirator #3 stating "Spoke with Anthony and they can now take care of us with qualified leads to go to telemed and volume will not be an issue. We are talking tomorrow about our needs and setup. Price will be $125 -$150 a lead so telemed will be $100. About to be a HUGE year boys." **[2] MCDOWELL** responded "Margin being ?? Per lead w/ Anthony …and he says volume won't be an issue …? That's huge."

L.      On or about April 6, 2020, **[1] WASHBURN** sent a text message to Co-Conspirator #4 and Co-Conspirator #3 regarding obtaining orders from Co-Conspirator #4 that said "Make it rain DO's…."

M.      On or about May 3, 2020, **[1] WASHBURN** sent an email to a Co-Conspirator #4, copying **[2] MCDOWELL,** regarding DME medical necessity denials by Telemedicine Company #1's purported telemedicine doctors in which **[1] WASHBURN** stated, "I know its truly a numbers thing for them so that they appear to be compliant. Clearly, [Telemedicine Company #1] makes sure they have a certain % that fail. That said, lets [sic] resubmit every deal from now on that fails under a different phone #. Also did you see the new changes for CMS regarding Telemed??? Basically, wide open for the foreseeable future."

N.      On or about May 4, 2020, **[1] WASHBURN** sent a group text to **[2] MCDOWELL** and Co-Conspirator #3 and stated, "Medicare has spread their legs wide open and we need to take advantage NOW. I won't take no for an answer honestly."

O.      On or about June 9, 2020, **[1] WASHBURN** signed and submitted a DME supplier application to CMS for Limestone Medical LLC.

7

P.     On or about July 1, 2020, **[2] MCDOWELL** entered into a contract with Marketing Company #1 on behalf of Limestone Medical LLC that purported to contract for hourly marketing services.

Q.     On or about July 7, 2020, **[1] WASHBURN** sent an email to a co-conspirator marketer Co-Conspirator #4, copying **[2] MCDOWELL**, and stated, "For this to work, we need a healthy margin so that we can scale with you as we discussed earlier on the phone. With our order of 10 DO's per week, we really need the following: 10 backs, 8 knees, and a combo of 5 or so ankle/shoulder/wrist. . . . to avoid audit risk, we use an L code for Shoulders and Ankles that reimburse much less."

R.     In or about December 2020, **[2] MCDOWELL** purchased RiseMedical LLC.

S.     On or about January 6, 2021, **[1] WASHBURN** and **[2] MCDOWELL** entered into a subcontract with a marketer in order to provide diagnostic laboratory testing referrals to Laboratory #2.

T.     On or about June 10, 2021, **[2] MCDOWELL** submitted a change of ownership form to CMS for RiseMedical LLC, where he promised that he would comply with federal laws, including the Anti-Kickback Statute, and otherwise agreed not to submit or cause the submission of false or fraudulent claims.

U.     On or about June 15, 2021, **[1] WASHBURN** and **[2] MCDOWELL** entered into a contract with Laboratory #3 to provide purported marketing services for genetic tests.

V.     On or about July 13, 2021, **[2] MCDOWELL** sent an email to a marketer who advertised selling telehealth doctor orders for DME braces on LinkedIn, copying **[1] WASHBURN**, and stated "I've copied my business partner, Brady on this email. He'll send you a copy of our marketing agreement. As a note it will have a place for a flat fee per compliance. Please understand this is what our attorney requires and you and I can follow what we need to in order to get this project started (ie terms agreed upon already) Thanks!"

W.     On or about the dates listed below, **[1] WASHBURN** caused payments to be sent via wire transfer from the entities listed below, each transaction constituting an overt act:

| On or About Date | Payment From | Payment To | Receiving Bank | Amount |
|---|---|---|---|---|
| December 7, 2018 | Laboratory #1 | Global Med Marketing | Bank of America | $136,703.75 |
| April 1, 2019 | Laboratory #1 | Global Med Marketing | Bank of America | $12,830.50 |

8

| June 14, 2019 | Pharmacy #1 | **[1] WASHBURN** and Global Med Marketing | SunTrust | $999.98 |
| August 20, 2019 | Pharmacy #1 | **[1] WASHBURN** and Global Med Marketing | SunTrust | $13,750.00 |
| September 9, 2019 | Pharmacy #1 | **[1] WASHBURN** and Global Med Marketing | SunTrust | $41,250.00 |
| October 15, 2019 | Pharmacy #2 | **[1] WASHBURN** | First Farmers | $11,000.00 |

X.    On or about the dates listed below, **[1] WASHBURN** sent a payment to the entities listed below, via wire transfer, each constituting an overt act:

| On or About Date | Payment From | Payment To | Receiving Bank | Amount |
| --- | --- | --- | --- | --- |
| June 17, 2019 | **[1] WASHBURN** | Company #1 | Wells Fargo | $2,125.00 |
| July 15, 2019 | **[1] WASHBURN** | Company #1 | Wells Fargo | $1,700.00 |
| August 31, 2019 | **[1] WASHBURN** | Telemedicine Company #1 | Citibank | $4,200.00 |
| October 11, 2019 | **[1] WASHBURN** | Marketing Company #2 | PNC | $7,650.00 |

Y.    On or about the dates listed below, **[1] WASHBURN** and **[2] MCDOWELL** caused payments to be sent from the entities listed below, via wire transfer, each constituting an overt act:

| On or About Date | Payment From | Payment To | Receiving Bank | Amount |
| --- | --- | --- | --- | --- |
| May 17, 2021 | Laboratory #2 | Limestone Medical | SunTrust | $37,500.00 |
| June 1, 2021 | Laboratory #2 | Limestone Medical | SunTrust | $40,000.00 |

Z.    On or about the dates listed below, **[1] WASHBURN** and **[2] MCDOWELL** sent payments to the entities listed below, via wire transfer, each constituting an overt act:

9

| On or About Date | Payment From | Payment To | Receiving Bank | Amount |
|---|---|---|---|---|
| May 4, 2020 | Black Bear Medical | Marketing Company #1 | Bank of America | $6,335.00 |
| September 9, 2020 | Limestone Medical | Marketing Company #1 | Bank of America | $9,000.00 |
| November 19, 2020 | Limestone Medical | Marketing Company #3 | PNC | $6,250.00 |
| January 12, 2021 | Limestone Medical | Telemedicine Company #3 | TD Bank | $10,000.00 |
| March 26, 2021 | Limestone Medical | Telemedicine Company #1 | Citibank | $5,000.00 |
| May 4, 2022 | Black Bear Medical | Telemedicine Company #3 | TD Bank | $1,750.00 |

AA. On or about, March 8, 2023, **[1] WASHBURN** caused the submission of a DME supplier application to CMS for Iris Med LLC.

## Count 18

With respect to Count 18 of the Indictment, from approximately 2019 and continuing until June 2024, in the Middle District of Tennessee and elsewhere, defendant did knowingly and willfully combine, conspire, confederate, and agree with Robert Houston McDowell, and others, including marketers and owners and affiliates of laboratories, pharmacies, DME supply companies, and telemedicine companies, to commit certain offenses against that United States, that is, to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined by Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said healthcare benefit program, in connection with the delivery and payment for health care benefits, items and services, in violation of Title 18, United States Code, Section 1347.

Genetic tests are a form of diagnostic tests. Medicare did not routinely cover all kinds of diagnostic testing. When testing was covered, it was subject to certain conditions, including that the test be necessary for the diagnosis or treatment of an illness and injury and that the test be ordered by a beneficiary's treating physician. Medicare also did not cover DME or medications that were not medically necessary, among other requirements. Medicare does not pay for items or services procured through the payment or receipt of kickbacks. Defendant was aware of these requirements.

10

Defendant agreed with others, including Robert Houston McDowell, marketers, and individuals controlling purported telemedicine companies and affiliates to submit claims to Medicare, for genetic tests, pharmacy prescription drugs, and DME, that were not eligible for reimbursement. Defendant knew the items and services were not medically necessary. Additionally, defendant knew the purported telemedicine medical providers ordered tests without regard to medical necessity and in exchange for the payment of kickbacks. Defendant also knew that the referrals for DME, genetic tests, and pharmacy prescription drugs were induced by the payment and receipt of kickbacks.

As a DME supplier who owned or had interest in the DME companies, Defendant admits he received information from Medicare beneficiaries for whom he submitted claims for reimbursement to Medicare that included representations that the Medicare beneficiary did not know the ordering physician for an item, did not want the item, had not ordered the item, and did not know why the item had been shipped to them. Defendant admits he submitted, or caused to be submitted, false and fraudulent claims to Medicare that represented that DME items were medically necessary even though they were not. He admits that he knew at the time of the conduct that submitting such claims violated the law.

## Loss

During the course of defendant's involvement in the conspiracy, defendant, through his DME companies and those owned by his co-conspirators, submitted claims in the approximate amount of $8 million to Medicare. Defendant, through the DME companies, was paid approximately $3 million on those claims submitted to Medicare. As defendant knew, the DME companies were not entitled to receive reimbursement for these claims, including because the doctors' orders and patient information were procured through kickbacks and bribes.

Defendant admits he received kickbacks and he paid kickbacks to telemedicine companies and marketing companies for patient information and doctors' orders. Defendant, individually and through his marketing companies, admits he was paid kickbacks in the amount of approximately $1 million.

This statement of facts is provided to assist the Court in determining whether a factual basis exists for defendant's plea of guilty and criminal forfeiture. The statement of facts does not contain each and every fact known to defendant and to the United States concerning defendant's and/or others' involvement in the offense conduct and other matters.

11

## Sentencing Guidelines Calculations

8.     The parties understand that the Court will take account of the United States Sentencing Guidelines (hereinafter "U.S.S.G."), together with the other sentencing factors set forth at 18 U.S.C. § 3553(a), and will consider the U.S.S.G. advisory sentencing range in imposing defendant's sentence. The parties agree that the U.S.S.G. to be considered in this case are those effective at the time of sentencing.

9.     For purposes of determining the U.S.S.G. advisory sentencing range, the United States and defendant agree to recommend to the Court, pursuant to Rule 11(c)(1)(B), the following:

    a.     Offense Level Calculations.

        i.     The counts of conviction, Counts 1 and 18, group together pursuant to U.S.S.G. § 3D1.2(d), because the offense level is determined largely on the basis of the total amount of harm or loss. The parties agree that U.S.S.G. § 2B1.1 will likely apply to calculate the total offense level because, pursuant to U.S.S.G. § 3D1.3(a), it is the offense guideline likely to produce the highest offense level.

        ii.     The base offense level for the counts of conviction is 6, pursuant to U.S.S.G. § 2B1.1(a).

        iii.     The parties agree that that the base offense level is increased by 18 levels because the amount of loss under U.S.S.G. § 2B1.1(b)(1)(J) is greater than $3.5 million, but less than $9.5 million.

        iv.     The parties agree that, pursuant to this plea agreement, the defendant will be convicted of a Federal health care offense, as referenced in U.S.S.G. § 2B1.1(b)(7). Because the loss to the Government health care program is greater

12

than $7,000,000, an upward adjustment under U.S.S.G. § 2B1.1(b)(7)(ii) will apply and increase the base offense level by 3 levels.

v. The application of any other potential enhancements are not agreed by the parties and are reserved for sentencing. The parties do not have an agreement about whether U.S.S.G. § 4C1.1 will apply to reduce the base offense level.

vi. Assuming defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the government, through his allocution and subsequent conduct prior to the imposition of sentence, a 2-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming defendant accepts responsibility as described in the previous sentence, the United States will move for an additional one-level reduction pursuant to U.S.S.G § 3E1.1(b), because defendant will have given timely notice of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently.

vii. The parties further agree that a downward departure may be appropriate, as further discussed below.

b. Criminal History Category. The parties have no agreement about the defendant's criminal history, but the parties anticipate that defendant's criminal history will be Criminal History Category I.

c. Recommended Offense Level. The parties have no agreement about the total recommended offense level, prior to any downward departure, because the parties do not have agreement as the application of additional enhancements or downward adjustments. The parties otherwise agree to the application of the guidelines as described

13

above. Defendant understands that the offense level as ultimately determined by the Court prior to any downward departure (the "court-determined offense level") may include an application of the guidelines that is different than as described above. Defendant likewise understands that the guidelines range as ultimately determined by the Court prior to any downward departure (the "court-determined guidelines range") may be based on an application of the guidelines that is different than as described above. A downward departure from the court-determined guidelines range may be appropriate under U.S.S.G. § 5K1.1, as set forth herein. Defendant is free to argue for a downward departure under provisions of Chapter 5 of the U.S.S.G. other than Section 5K1.1.

d.     Defendant is aware that any estimate of the offense level or guidelines range that defendant may have received from defendant's counsel, the United States, or the Probation Office is a prediction, not a promise, and is not binding on the Probation Office or the Court. Defendant understands that the Probation Office will conduct its own investigation and make its own recommendations, that the Court ultimately determines the facts and law relevant to sentencing, that the Court's determinations govern the final guidelines calculations, and that the Court determines both the final offense level and the final guidelines range. Accordingly, the validity of this agreement is not contingent upon the Probation Officer's or the Court's concurrence with the above calculations. In the event that the Probation Office or the Court contemplates any U.S.S.G. adjustments, departures, or calculations different from those recommended above, the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same. Defendant further acknowledges that if the Court does not accept the guidelines calculations of the parties, defendant will have no right to withdraw his guilty plea.

14

Cooperation

10.     Defendant agrees to cooperate fully and truthfully with the United States and to provide all information known to him regarding any criminal activity. In that regard:

    a.     Defendant agrees to respond truthfully and completely to any and all questions that may be put to him, whether in interviews, before a grand jury, or at any trial(s) or other court proceedings.

    b.     Defendant agrees to be reasonably available for debriefings and pre-trial conferences as the United States may require.

    c.     Defendant agrees to produce voluntarily any and all documents, records, writings, or materials of any kind in his possession or under his care, custody, or control relating directly or indirectly to all areas of inquiry and investigation.

    d.     Defendant consents to continuances of his sentencing hearing as requested by the United States.

11.     Nothing in this Plea Agreement requires the government to accept any cooperation or assistance that defendant may choose to proffer. The decision as to whether and how to use any information and/or cooperation that defendant provides (if at all) is in the exclusive discretion of the United States.

12.     Defendant must at all times give complete, truthful, and accurate information and testimony, and must not commit, or attempt to commit, any further crimes. Defendant understands that if he falsely implicates an innocent person in the commission of a crime, exaggerates the involvement of any person in the commission of a crime in order to appear cooperative, or falsely minimizes the involvement of any person in the commission of a crime in order to protect that person, then defendant will be in violation of the Plea Agreement. Should the United States

15

determine that defendant has failed to cooperate fully, has intentionally given false, misleading, or incomplete information or testimony, has committed or attempted to commit any further crimes, or has otherwise violated any provision of this Plea Agreement, the United States, may in its discretion and as appropriate in light of particular circumstances: (1) prosecute defendant for perjury, false declarations or statements, and obstruction of justice; (2) prosecute any other crime alleged in the indictment that would have otherwise been dismissed at sentencing; (3) charge defendant with other crimes; and (4) recommend a sentence up to the statutory maximum.

13. This Plea Agreement is not conditioned upon charges being brought against any other individual. This Plea Agreement is not conditioned upon any outcome in any pending investigation. This Plea Agreement is not conditioned upon any result in any future prosecution that may occur because of defendant's cooperation. This Plea Agreement is conditioned upon defendant providing full, complete, and truthful cooperation.

14. If the United States in its sole discretion determines that defendant has cooperated fully, provided substantial assistance to law enforcement authorities, and otherwise complied with the terms of this Plea Agreement, prior to sentencing the government shall file a motion pursuant to U.S.S.G. § 5K1.1 with the Court setting forth the nature and extent of defendant's cooperation. Defendant understands that at the time this Plea Agreement is entered, no one has promised that a substantial assistance motion will be made on defendant's behalf.

15. The United States cannot, and does not, make any promise or representation as to what sentence defendant will receive. The United States will inform the Probation Office and the Court of (a) this Plea Agreement; (b) the nature and extent of defendant's activities with respect to this case and all other activities of defendant that the United States deems relevant to sentencing; and (c) the nature and extent of defendant's cooperation.

16

<u>Agreements Relating to Sentencing</u>

16.     If the government determines, in its sole discretion, that defendant has provided substantial assistance to the government in the investigation and prosecution of another person who has committed an offense, then the government shall move the Court to depart downward from the court-determined guidelines range pursuant to U.S.S.G. § 5K1.1. In that case, the government, in its sole discretion, also may recommend that the Court impose a particular sentence or depart downward to a particular extent. Defendant understands that the decision whether, and to what extent, to depart below the court-determined guidelines range rests solely with the Court.

17.     Each party is free to recommend whatever sentence it feels appropriate.

18.     Defendant understands that if the government does not move the Court to depart downward from the court-determined guidelines range pursuant to U.S.S.G. § 5K1.1, the Court shall impose a sentence taking into consideration the court-determined guidelines range together with other sentencing factors. Defendant may not withdraw his plea of guilty because the government has determined not to make a motion pursuant to U.S.S.G. § 5K1.1.

19.     It is understood by the parties that the Court is neither a party to nor bound by this Plea Agreement and, after consideration of the U.S.S.G., may impose the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea. Similarly, defendant understands that any recommendation by the Court related to location of imprisonment is not binding on the Bureau of Prisons.

20.     Regarding restitution, the parties acknowledge that restitution is owed to Medicare, and that pursuant to Title 18, United States Code, Section 3663A, the Court must order defendant

17

to make restitution in an amount to be determined by the Court at sentencing. Unless the Court orders otherwise, restitution shall be due immediately.

21.     Defendant agrees to pay the special assessment of $200 at the time of sentencing to the Clerk of the U.S. District Court.

<u>Forfeiture in the Form of Money Judgments</u>

22.     The Forfeiture Allegation of the Indictment put the defendant on notice that upon conviction of Counts 1 and 18, defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses, pursuant to Title 18, United States Code, Section 982(a)(7). By entry of a guilty plea to Counts 1 and 18 of the Indictment, defendant acknowledges that certain property is subject to forfeiture and that he has had an opportunity to be heard on this matter.

23.     By entry of a guilty plea to Counts 1 and 18, Defendant acknowledges that property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses is subject to forfeiture pursuant to Title 18, United States Code, Section 982(a)(7).

24.     The value of the property subject to forfeiture, including the amount of proceeds from the offenses of conviction, is to be agreed to by the parties ahead of sentencing, or otherwise determined by the Court at sentencing.

25.     Defendant acknowledges that as a result of his acts or omissions, the proceeds of the offenses of conviction:

        a.     cannot be located upon exercise of due diligence;

        b.     has been transferred or sold to, or deposited with, a third party;

        c.     has been placed beyond the jurisdiction of the Court;

18

        d.     has been substantially diminished in value; or

        e.     has been commingled with other property, which cannot be divided without difficulty

and as a result, pursuant to 21 U.S.C. § 853(p), the United States is entitled to forfeiture of substitute property up to the value of money judgments entered at sentencing.

26.     Defendant will cooperate and assist the United States in its efforts to recover the proceeds of the crime.

27.     Defendant further acknowledges that the United States is entitled to forfeiture of substitute property in the amount of the forfeitable property determined by the Court, and therefore agrees to the forfeiture of substitute assets and entry of an order allowing the United States to conduct any discovery proper in identifying, locating or disposing of the property subject to forfeiture, including depositions, interrogatories, requests for production of documents and the issuance of subpoenas, without further application to the Court and to facilitate the identification and location of property declared forfeited, substitute assets, and to facilitate the disposition of any petitions for remission, mitigation or restoration. The substitute property recovered shall not exceed in total amount of money judgements entered by the Court.

28.     Defendant further agrees to cooperate fully and to execute any supplementary documents, including authorizing the United States to obtain his credit report, and to take any additional actions that may be necessary or appropriate to effect this agreement as to forfeiture, restitution, and substitute assets.

29.     Defendant further authorizes the United States Probation and Pretrial Services Office to release the Presentence Investigative Report and all financial documents pertaining to defendant to the Asset Forfeiture Unit of the United States Attorney's Office ("AF Unit") for the Middle District of Tennessee.

30. Defendant further authorizes the release to the AF Unit of his financial statement submitted to the Court in her application for pro bono attorney.

31. Defendant further authorizes the Internal Revenue Service to release his tax returns for the years beginning 2018 through the present.

32. Defendant and the United States agree that every effort will be made to credit any payment toward forfeiture against both the Order of Forfeiture and any restitution order via the remission and restoration process prescribed at 28 C.F.R. § 9 and 18 U.S.C. § 3664, respectively. However, the parties acknowledge that the ultimate discretion lies with the Money Laundering and Asset Recovery Section of the U.S. Department of Justice regarding whether to grant or deny any request related to the remission or restoration.

33. Defendant understands that—with the exception of restitution as set forth previously—forfeiture of this property shall not be treated as satisfaction of any fine, cost of imprisonment, or any other penalty the Court may impose upon defendant in addition to the Order of Forfeiture.

34. Defendant agrees to waive all appellate rights concerning the entry of the money judgment and all matters related thereto.

<u>Presentence Investigation Report/Post-Sentence Supervision</u>

35. Defendant understands that the United States Attorney's Office, in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing, shall fully apprise the District Court and the United States Probation Office of the nature, scope, and extent of defendant's conduct regarding the charges against him, as well as any related matters. The government will make known all matters in aggravation and mitigation relevant to the issue of sentencing, including the nature and extent of defendant's cooperation.

36.     Defendant agrees to execute truthfully and completely a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the United States Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the Probation Officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1 and enhancement of his sentence for obstruction of justice under U.S.S.G. § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001, or as a contempt of the Court.

37.     This Plea Agreement concerns criminal liability only. Except as expressly set forth in this Plea Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Plea Agreement are limited to the United States Attorney's Office for the Middle District of Tennessee and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Plea Agreement.

38.     Defendant understands that nothing in this Plea Agreement shall limit the Internal Revenue Service (IRS) in its collection of any taxes, interest, or penalties from defendant.

<u>Entry of Guilty Plea</u>

39.     The parties jointly request that the Court accept the defendant's pleas of guilty as set forth in this agreement and enter an order reflecting the acceptance of the plea while reserving acceptance of this plea agreement until receipt of the pre-sentence report and sentencing.

<u>Waiver of Appellate Rights</u>

40.     Regarding the issue of guilt, defendant hereby waives all (i) rights to appeal any issue bearing on the determination of whether he is guilty of the crimes to which he is agreeing to plead guilty; and (ii) trial rights that might have been available if he exercised his right to go to trial. Regarding sentencing, Defendant is aware that 18 U.S.C. § 3742 generally affords a defendant the right to appeal the sentence imposed. Acknowledging this, defendant knowingly waives the right to appeal any sentence within or below the court-determined guidelines range. Defendant also knowingly waives the right to challenge the sentence imposed in any motion pursuant to 18 U.S.C. § 3582(c)(2) and in any collateral attack, including, but not limited to, a motion brought pursuant to 28 U.S.C. § 2255 and/or § 2241. However, no waiver of the right to appeal, or to challenge the adjudication of guilt or the sentence imposed in any collateral attack, shall apply to a claim of involuntariness, prosecutorial misconduct, or ineffective assistance of counsel. Likewise, the government waives the right to appeal any sentence: (i) within or above the court-determined guidelines range; or (ii) below such guideline range if the government has moved for a downward departure pursuant to U.S.S.G. § 5K1.1.

<u>Other Terms</u>

41.     Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine and restitution for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

22

Defendant further agrees that any monetary penalties imposed by the Court will be subject to immediate enforcement as provided for in 18 U.S.C. § 3613, and submitted to the Treasury Offset Programs so that any federal payment or transfer of returned property the defendant receives may be offset and applied to federal debts but will not affect the periodic payment schedule.

42.     Defendant agrees to cooperate with the IRS in any tax examination or audit of defendant that directly or indirectly relates to or arises out of the course of conduct defendant has acknowledged in this Plea Agreement, by transmitting to the IRS original records or copies thereof, and any additional books and records that the IRS may request. Nothing in this paragraph precludes defendant from asserting any legal or factual defense to taxes, interest, and penalties that may be assessed by the IRS.

43.     Should defendant engage in additional criminal activity after he has pled guilty but prior to sentencing, defendant shall be considered to have breached this Plea Agreement, and the government at its option may void this Plea Agreement.

Conclusion

44.     Defendant understands that the Indictment and this Plea Agreement have been or will be filed with the Court, will become matters of public record, and may be disclosed to any person.

45.     Defendant understands that his compliance with each part of this Plea Agreement extends until such time as he is sentenced, and failure to abide by any term of the Plea Agreement is a violation of the Plea Agreement. Defendant further understands that in the event he violates this Plea Agreement, the government, at its option, may move to vacate the Plea Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Plea Agreement, or may require defendant's specific performance of this Plea

23

Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Plea Agreement, or defendant breaches any of its terms and the government elects to void the Plea Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Plea Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Plea Agreement and the commencement of such prosecutions.

46.     Defendant and his attorney acknowledge that no threats have been made to cause defendant to plead guilty.

47.     No promises, agreements, or conditions have been entered into other than those set forth in this Plea Agreement and any proffer agreement, and none will be entered into unless memorialized in writing and signed by all of the parties listed below.

48.     <u>Defendant's Signature:</u> I hereby agree that I have consulted with my attorney and fully understand all rights with respect to the pending Indictment. Further, I fully understand all rights with respect to the provisions of the Sentencing Guidelines that may apply in my case. I have read this Plea Agreement and carefully reviewed every part of it with my attorney.  I understand this Plea Agreement, and I voluntarily agree to it.

Date: 2/21/25

_____
JAMES BRANDON WASHBURN
Defendant

49. <u>Defense Counsel Signature:</u> I am counsel for defendant in this case. I have fully explained to defendant his rights with respect to the pending Indictment. Further, I have reviewed the provisions of the Sentencing Guidelines and Policy Statements, and I have fully explained to defendant the provisions of those guidelines that may apply in this case. I have reviewed carefully every part of this Plea Agreement with defendant. To my knowledge, defendant's decision to enter into this Plea Agreement is an informed and voluntary one.

Date: 2/21/25                                            

Luke Evans
Defense Attorney

Respectfully submitted,

Robert E. McGuire
Acting United States Attorney

By: s/ Sarah K Bogni
SARAH K. BOGNI
ROBERT S. LEVINE
Assistant U.S. Attorneys

By: Kat Booth /sbs by permission
KATHRYN W. BOOTH
Deputy Criminal Chief-White Collar Crime